UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
PIERCE & WEISS, LLP,

                          Plaintiff,

    - against -

SUBROGATION PARTNERS LLC,
AON RECOVERY INC., and
AON RE INC.,

                         Defendants.
-----------------------------------------------------X

**MEMORANDUM &
O R D E R**

08 CV 4676 (NGG)

On November 19, 2008, plaintiff Pierce & Weiss, LLP, a law firm with offices in Los

Angeles and Anaheim, California (the "Pierce Firm"), commenced this action against

Subrogation Partners LLC ("Subrogation"), AON Recovery, Inc. ("AON"), and AON Re, Inc.

(collectively with AON and Subrogation, "defendants"), seeking reimbursement for legal fees

due and owing in connection with plaintiff's retention by defendant Subrogation with respect to

certain civil litigation brought on behalf of Core-Mark International, Inc. and Core-Mark

MidContinent, Inc. (together "Core-Mark"), arising out of a warehouse fire in Colorado.

(Compl.[1] ¶ 13). The Complaint alleges breach of the written attorney-client retainer contract.

(Id. ¶ 1).

On October 28, 2009, the Pierce Firm's attorney of record in the instant suit, Samuel C.

Spirgel, Esq., was relieved from further representation of the Pierce Firm and the Firm was given

time to retain new counsel. Currently pending before the Court is a motion to be admitted pro

---

[1]Citations to "Compl." refer to plaintiff's Complaint in this action filed on November 19,
2008.

hac vice, filed on December 8, 2009 by Brian Letofsky, Esq., and Daniel Watkins, Esq., from the firm of Watkins & Letofsky, LLP,[2] located in Newport Beach, California.[3] Defendants oppose the Pierce Firm's pro hac vice motion, arguing that Letofsky and Watkins should be disqualified from representing the Pierce Firm due to a conflict of interest based on Mr. Letofsky's representation of the defendants in other prior and currently pending matters, and based on Mr. Letofsky's role as a critical witness in the events underlying this action. On December 14, 2009, Mr. Letofsky filed a reply in support of the motion for admission pro hac vice, and this Court held a telephonic hearing on the motion on January 7, 2010.

Based on the Court's consideration of the relationship of Mr. Letofsky to AON and Subrogation, the Court denies Letofsky and Watkins' motions for admission pro hac vice.


## FACTUAL BACKGROUND

According to the Declaration of Robert R. Gianelli, currently Director of Recovery Services for AON Recovery, AON provides claim recovery services to insurance carriers and self-insured entities, assisting them in recovering from tortfeasors or other legally responsible parties those monies paid to the carriers' insureds to compensate them for losses caused by the tortfeasor. (Gianelli Dec. ¶ 8). For example, if an insurance carrier reimbursed its insured for injuries suffered in an automobile accident, the carrier would thereafter become subrogated to the

---

[2]Watkins & Letofsky is currently known as Watkins Casaudoumecq & Letofsky, LLP, according to its website, www.wcllp.net/. However, the firm will be referred to herein as Watkins & Letofsky for the purposes of this motion.

[3]The Pierce Firm is also represented in this action by Simon Gluck, Esq., from Lawrence, N.Y., who filed a Notice of Appearance on November 13, 2009, and who is acting as local counsel to plaintiff in this case.

insured's claims against the tortfeasor who caused the accident. (Id. ¶ 10). The carrier would retain AON to pursue those subrogation claims through negotiation, arbitration, or, if necessary, through lawsuits brought against the tortfeasor. (Id.) AON would then charge the insurance carrier or self-insured entity a contingency fee based on the total amount recovered. (Id. ¶ 9). According to Mr. Gianelli, he was formerly employed by Subrogation, which, prior to its acquisition by AON on February 28, 2008, performed the same type of services currently performed by AON. (Id. ¶ 6).

The parties dispute the role and relationship of the attorneys that are retained to conduct the subrogation litigation. In his Declaration, Mr. Gianelli contends that AON and Subrogation hire and directly pay the attorneys who are retained to pursue the subrogation claims; these attorneys have no contractual relationship with the insurance carriers or self-insured customers of AON or Subrogation. (Id. ¶¶ 11, 12). According to Mr. Gianelli, AON chooses which attorneys to retain and determines the amount of payment to the attorneys. (Id. ¶ 11). AON receives status reports regarding the progress of the case, evaluates settlement offers, and reserves the right to terminate the attorneys. (Id. ¶ 12). Mr. Gianelli states that Watkins & Letofsky have handled dozens of cases for AON since the firm opened. (Id. ¶ 13).

The parties agree that Brian Letofsky was formerly a partner at the Pierce Firm, the client who now seeks to retain him in this matter. (Letofsky Aff.[4] ¶ 7). While Letofsky was employed by the Pierce Firm, defendant Subrogation retained Letofsky and assigned over 100 cases to the Firm to prosecute subrogation actions on behalf of insurance carriers and other of Subrogation's

---

[4]Citations to "Letofsky Aff." refers to the Affidavit of Brian Letofsky in Support of Admission to Practice Pro Hac Vice, filed on November 24, 2009.

clients that were seeking to recover money owed by debtors and other third-party defendants. (Id. ¶ 6). In his Declaration, Mr. Gianelli states, and plaintiff does not dispute, that Letofsky is currently an attorney hired by AON and was formerly an attorney employed by Subrogation. (Gianelli Aff. ¶ 3).

The instant case stems from a fee dispute between the Pierce Firm and defendants over fees allegedly owed to Pierce & Weiss with respect to one particular representation assigned to the Firm by defendant Subrogation. (Id.) Specifically, Subrogation retained Mr. Letofsky in October 2005, while he was still with the Pierce Firm, to represent Core-Mark in a litigation filed in Colorado. (Pl.'s Rep.[5] at 1). Mr. Letofsky claims that even though Core-Mark terminated its relationship with Subrogation in the fall of 2006, he has continued to pursue the Core-Mark litigation since leaving the Pierce Firm and moving to his new law firm.[6] (Id. at 1). However, according to Letofsky, he has not accepted any new assignments from Subrogation or AON since leaving the Pierce Firm, although he has continued to prosecute the remaining inventory of cases assigned to him by those two companies. (Id. at 2). Mr. Letofsky's new partner, Daniel Watkins, Esq., also seeks admission pro hac vice to represent plaintiff in this matter. Mr. Watkins was not previously a lawyer at the Pierce Firm and has not previously been hired by defendants in any matter.

---

[5]Citations to "Pl.'s Rep." refers to Plaintiff's Reply to Opposing Declaration of Robert Gianelli, filed on December 14, 2009.

[6]The precise date when Mr. Letofsky left the Pierce Firm is not provided in the record and Mr. Letofsky has not provided any documentation with respect to the terms of his current relationship with the Core-Mark companies. Thus, it is unclear whether he continues to operate under the earlier retainer agreement which was between the Pierce Firm and Subrogation (see discussion infra), or whether there is a new agreement between him and CoreMark directly as the client.

In opposing Letofsky's and Watkins' applications for admission pro hac vice, defendants argue that they should be disqualified from representing the Pierce Firm in this suit against AON and Subrogation because: 1) AON is currently a client of Letofsky's; 2) Subrogation is a former client of Letofsky's; and 3) Letofsky is a critical witness in the fee dispute because he negotiated the retainer agreement that is at the heart of the controversy.

Mr. Letofsky argues that neither Subrogation nor AON was ever his client because they were never a named party in any litigation that he was involved in as an attorney. (Id.) Rather, he contends that Subrogation and AON merely assigned him cases and paid him fees for his work. (Id.) Mr. Letofsky argues that the true clients in these cases were the named parties, the insurance carriers or other entities for whom he was pursuing claims, and not AON or Subrogation, which were merely the third-party administrators that assigned him the cases and paid for his work. (Id. at 2-3).[7]

Defendants dispute Mr. Letofsky's claim, contending that neither AON or Subrogation are third-party administrators. In support of that argument, defendants have produced a copy of the "Attorney-Client Retainer Contract" between the Pierce Firm and Subrogation, effective September 23, 2005 (the "Contract"), which relates specifically to the representation of the Core-Mark companies. (Defs.' Exh. B[8] at 1). This Contract is itself the subject of the underlying Complaint filed by Pierce & Weiss against defendants in this action. The Contract states that the

---

[7]Unfortunately, Mr. Letofsky's Affidavit and Reply fail to cite to a single legal precedent, case law or statute. They merely assert that there is no conflict and that neither of the defendants was ever a client.

[8]Citations to "Defs.' Exh. B" refers to the "Attorney-Client Retainer Contract" submitted with Defendants' papers on December 8, 2009.

"Client [Subrogation][9] hires Attorney to represent Client with respect to civil litigation claims in Colorado." The Contract further provides that "while Core-Mark is the named plaintiff. . . Attorney [the Pierce Firm] acknowledges that Client [Subrogation] is Attorney's client under this agreement." (Defs.' Exh. B ¶ 2(C).) The Contract also states that: "Attorney will not accept any offer to settle without first obtaining the approval of Client [Subrogation]." (Id. ¶ 6). The Contract was signed by Brian Letofsky on October 4, 2005, while he was an attorney employed by the Pierce Firm. (Id. ¶ 16).

Mr. Letofsky continues to represent Core-Mark in the Colorado litigation, which is currently awaiting trial in Colorado, scheduled to begin on March 1, 2010. However, Mr. Letofsky claims that Core-Mark terminated its relationship with Subrogation in the fall of 2006. Therefore, he contends that neither Subrogation nor AON retain any interest in the Core-Mark litigation.

In response, defendants claims that even if Subrogation is no longer involved in the Core-Mark action, AON is a current client of Mr. Letofsky and he continues to perform work for AON on other matters, thus creating a direct conflict with this litigation. In that regard, defendants have submitted a copy of an invoice, dated September 23, 2009, in which Watkins & Letofsky billed for services performed in a case called Hudson Insurance Co. v. Fire Eng. Co. totaling $1,614.44. (Defs.' Exh. A). Although the bill was addressed to Subrogation for work performed on behalf of Subrogation, at the time the invoice was submitted, Subrogation had been acquired by AON so AON became responsible for payment.

---

[9]The term "Client" is defined in the Contract as Subrogation Partners. (Defs.' Exh. B. ¶ 1).

DISCUSSION

A. <u>Standards</u>

It is well established that the Court's authority to disqualify an attorney stems from its

general supervisory power over the attorneys appearing before it, <u>see Handelman v. Weiss</u>, 368

F. Supp. 258, 263 (S.D.N.Y. 1973); <u>see also United States v. Miller</u>, 624 F.2d 1198, 1201 (3d

Cir. 1980), and the determination of disqualification is discretionary in nature. <u>Hull v. Celanese</u>

<u>Corp.</u>, 513 F.2d 568, 571 (2d Cir. 1975); <u>see also Laker Airways Ltd. v. Pan Am. World</u>

<u>Airways</u>, 103 F.R.D. 22, 27 n.4 (D.D.C. 1984). There is a longstanding rule that,

> [w]hen dealing with ethical principles, . . . we cannot
> paint with broad strokes. The lines are fine and must
> be so marked. Guideposts can be established when
> virgin ground is being explored, and the conclusion in
> a particular case can be reached only after painstaking
> analysis of the facts and precise application of
> precedent.

<u>Fund of Funds, Ltd. v. Arthur Andersen & Co.</u>, 567 F.2d 225, 227 (2d Cir. 1977) (quoting <u>United</u>

<u>States v. Standard Oil Co.</u>, 136 F. Supp. 345, 367 (S.D.N.Y. 1955)). Indeed, as the court in <u>Fund</u>

<u>of Funds, Ltd.</u> noted, "in deciding questions of professional ethics men of good will often differ

in their conclusions." <u>Id.</u> Recognizing this, the Second Circuit has held that the district court's

finding will only be overturned upon a showing of abuse of that discretion. <u>Bobal v. Rensselaer</u>

<u>Polytechnic Inst.</u>, 916 F. 2d 759, 764 (2d Cir. 1990) (citing <u>Hull v. Celanese Corp.</u>, 513 F.2d at

571), <u>cert. denied</u>, 499 U.S. 943 (1991).

In considering defendants' opposition to the motion for admission pro hac vice and the

argument that the plaintiff's attorneys should be disqualified, this Court is mindful of its

responsibility to "preserve a balance, delicate though it may be, between an individual's right to

7

his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 564-65 (2d Cir. 1973); accord General Motors Corp. v. City of N.Y., 501 F.2d 639, 649 (2d Cir. 1974); see also Fund of Funds Ltd. v. Arthur Andersen & Co., 567 F.2d at 237 (noting that "above all else, we must maintain public trust in the integrity of the Bar"). The Court is also mindful of its responsibility to supervise the members of its bar, see id., and recognizes the admonition of the Second Circuit that "any doubt is to be resolved in favor of disqualification." Hull v. Celanese Corp., 513 F.2d at 571; see also Baird v. Hilton Hotel Corp., 771 F. Supp. 24, 27 (E.D.N.Y. 1991) (holding that "'if there were any doubt as to the propriety of our action, we would resolve it in favor of disqualification'") (quoting Cheng v. GAF Corp., 631 F.2d 1052, 1059 (2d Cir. 1980), judgment vacated on other grounds, 450 U.S. 903 (1981)).

The disqualification of an attorney upon the motion of opposing counsel is a serious sanction that ought not be imposed lightly. It is well-established that courts in the Second Circuit approach motions for disqualification with "fairly strict scrutiny" and that they are generally disfavored. See Lamborn v. Dittmer, 873 F.2d 522, 531 (2d Cir. 1989); accord Ragdoll Prods. (UK) Ltd. v. Wal-Mart Stores, Inc., No. 99 CV 2101, 1999 WL 760209, at *1 (S.D.N.Y. Sept. 27, 1999) (holding that motions to disqualify are "subject to strict scrutiny"); see also Stratavest Ltd. v. Rogers, 903 F. Supp. 663, 666 (S.D.N.Y. 1995) (noting that "[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit"); United States Football League v. Nat'l Football League, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985) (holding same).

Indeed, courts have become increasingly "skeptical of motions to disqualify counsel, and they now approach them with cautious scrutiny." Laker Airways Ltd. v. Pan American World

8

Airways Ltd., 103 F.R.D. at 28. See also Bennett Silvershein Assocs. v. Furman, 776 F. Supp. 800, 802 (S.D.N.Y. 1991) (noting that "[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are 'often interposed for tactical reasons'") (citing United States Football League v. Nat'l Football League, 605 F. Supp. at 1452 (collecting cases)); Laker Airways Ltd. v. Pan American World Airways, 103 F.R.D. at 28 (noting that "[d]isqualification motions have become increasingly popular tools of the litigation process, being used . . . for purely strategic purposes") (internal quotations omitted). At least one court has commented that "[d]isqualification motions are subject to abuse for tactical purposes," often resulting in "complex satellite litigation extraneous to the case." Universal City Studios, Inc. v. Reimerdes, 98 F. Supp. 2d 449, 455 (S.D.N.Y. 2000); see also Evans v. Artek Sys. Corp., 715 F.2d 788, 790 (2d Cir. 1983) (noting that "'even when made in the best of faith, such motions inevitably cause delay'") (quoting Board of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)).

Moreover, because disqualification deprives a client of its choice of counsel, the Second Circuit has cautioned courts that disqualification of an attorney is only appropriate where there has been a clear violation of the Rules of Professional Conduct that leads to a "significant risk of trial taint," Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981), such as when "the attorney is in a position to use privileged information acquired in the representation of a client against that client in another matter," Universal City Studios, Inc. v. Reimerdes, 98 F. Supp. 2d at 455, or when "there is a significant risk that [a conflict of interest] will affect the attorney's ability to represent his or her client with vigor." Id.; see also Mitchell v. Metro. Life Ins. Co., Inc., No. 01 CV 2112, 2002 WL 441194, at *4 (E.D.N.Y. Mar. 21, 2002) (noting that "relief will be granted only when the facts concerning the lawyer's conduct pose[ ] a significant risk of trial

taint").

Attorneys arguing before this Court must abide by the newly implemented New York

State Rules of Professional Conduct (the "Rules"), 22 N.Y.C.R.R. § 1200, which replaced the old

Canons and Disciplinary Rules that were formerly in place in the State of New York.  See

E.D.N.Y. Local Rule 1.3.  The New York Rules of Professional Conduct were revised and

implemented on April 1, 2009.[10]  To interpret the Rules, this Court may look to decisions of the

New York State courts.  E.D.N.Y. Local Rule 1.5(b)(5).  Rule 1.7 states as follows:

> [A] lawyer shall not represent a client if a reasonable lawyer would
> conclude that either: (1) the representation will involve the lawyer in
> representing differing interests; or (2) there is a significant risk that the
> lawyer's professional judgment on behalf of a client will be adversely
> affected by the lawyer's own financial, business, property or other personal
> interests.

N.Y. Rules of Prof. Conduct 1.7(a), 22 N.Y.C. R.R. § 1200.

Under the former Canons and Disciplinary Rules, courts considering an alleged conflict

distinguished between situations involving concurrent and successive representation.  See, e.g.,

Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127, 133 (2d Cir.

2005) (holding that "[t]he standard for disqualification varies depending on whether the

representation is concurrent or successive").  If the representation was concurrent, it was

considered "'prima facie improper' for an attorney to simultaneously represent a client and

another party with interests directly adverse to that client." Id. (quoting Cinema 5, Ltd. v.

Cinerama, Inc., 528 F.2d 1384, 1387 (2d Cir. 1976)).  In such instances, the attorney with an

---

[10]The New York Rules of Professional Conduct, implemented on April 1, 2009, are
available at: http://www.nysba.org/Content/NavigationMenu/ForAttorneys/
ProfessionalStandardsforAttorneys/NYRulesofProfessionalConduct4109.pdf

apparent conflict of interest must be disqualified unless he can demonstrate "at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." Id. (quoting Cinema 5, 528 F.2d at 1387). Even though the Canons have been replaced by the New York Rules of Professional Conduct, the new rules still incorporate much of the substance of the old rules. See Merck Eprova AG v. ProThera, Inc., No. 08 CV 0035, 2009 WL 4067209, at *11, n.1 (S.D.N.Y. Sept. 17, 2009). Therefore, much of the precedent interpreting the old rules still remains applicable. Under both the new Rules and the Canons, it is clear that all attorneys owe a duty of undivided loyalty to the clients which have hired them. Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d at 1386. Clients have a right to expect that their lawyers will not accept money from other parties to act in a manner that is adverse to their interests. Id.

## B. Conflict Between Attorney and Current Client

This case is complicated by the fact that it involves a fee dispute between a lawyer, the Pierce Firm, and its former client, Subrogation. The Pierce Firm argues that it cannot be disqualified from representing itself in a suit to collect fees owed to the Firm from its client on this rationale. Clearly, in a situation where an attorney is seeking to recover fees from a client who has not paid the attorney for his services, the client cannot argue that the duty of undivided loyalty prevents his own attorney from pursuing his own claims if the client fails to pay the attorney monies owed. See, e.g., Seth Rubenstein, PC v. Ganea, 41 A.D.3d 54, 833 N.Y.S.2d 566 (2d Dep't 2007) (attorney representing himself to recover fees); Petition of Rosenman & Colin, 850 F.2d 57 (2d Cir. 1988) (law firm representing itself pro se to recover fees owed by

11

client).

However, here Mr. Letofsky is no longer a member of the Pierce Firm, having started his own firm, nor is he suing defendants in his own name to recover monies owed to him individually, or to his current law firm, Watkins & Letofsky. If that were the case, Letofsky would be well within his right to represent himself in a fee dispute with defendants. Instead, in this case, he has been retained to sue Subrogation and AON to recover monies owed to his *old* firm. Thus, this is not analogous to a case where the Pierce Firm assigned an attorney within its own firm to represent itself, as argued by plaintiff.

The Second Circuit has already opined that "we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d at 1386. In the case of concurrent representation of two clients, suing one client on behalf of the other is "prima facie improper." Id. at 1387. However, this presumption may be rebutted if the attorney can show that "there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." Id.

Thus, the determinative question is whether or not AON Recovery should be considered a current client of Mr. Letofsky. Mr. Letofsky asserts that he has not "received or gained any client confidential information" (Letofsky Aff. 7), from his alleged representation of defendants, and his communications with defendants were not subject to the attorney-client privilege. Therefore, he argues that the defendants cannot be deemed to be his clients. (Pl.'s Rep. at 3).

Defendants have not alleged that they, in fact, imparted any confidential information to Mr. Letofsky in connection with his representation of Core-Mark or any other case assigned to

12

Letofsky. However, the rules concerning disqualification apply even when no client confidences have been shared because the rules serve additional purposes. First, the rule forbidding the representation of one client against another encourages clients to be completely honest and open with their attorneys. See Schairer v. Schairer 192 Misc.2d 155, 158, 745 N.Y.S.2d 410, 413 (N.Y. Sup. Ct. 2002). Even though defendants were not named parties in the litigation, they may have expected to share confidential information with Mr. Letofsky concerning their views on the case at the time he was hired. Certainly, to the extent that AON reviews settlement offers, it would be reasonable for AON to anticipate that any discussions about the strengths and weaknesses of the case, insofar as they may have an impact on settlement, would remain confidential. (See Gianelli Aff. ¶ 13).

Secondly, the rules on disqualification are in place to avoid even the "appearance" of representing conflicting interests. Id. Thus, although no actual conflict may exist, the appearance of one can still undermine faith in the judicial system and its fairness.

Finally, the New York state courts have specifically rejected Mr. Letofsky's argument, with one court holding that "the payment of legal fees [by a third party] may, in a proper case, create a conflict of interest even though it does not form the basis of a claim of privilege." Priest v. Hennessy, 51 N.Y.2d 62, 70, 409 N.E.2d 983, 987 n.3 (1980); see also Nichols v. Village Voice, Inc., 99 Misc. 2d 822, 824, 417 N.Y.S. 2d 415, 418 (N.Y. Sup. Ct. 1979) (stating that "[t]he disqualification of an attorney by reason of conflict of interest will not be denied solely because there is no actual attorney-client relationship between the parties").

Courts in New York employ a six-factor test to decide whether an attorney-client relationship exists, though no one factor is dispositive. Merck Eprova AG v. ProThera, Inc.,

2009 WL 4067209, at *8. The factors include:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of [the] litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

Id. Mr. Gianelli, an employee of AON, states in his affidavit that AON is a current client of Mr. Letofsky. (Gianelli Aff. ¶ 3). Mr. Gianelli does not specifically identify any cases that Watkins & Letofsky is currently handling for AON, but does state that Watkins & Letofsky is currently handling subrogation claims involving automobile and property damage and worker's compensation on behalf of AON. (Gianelli Aff. ¶ 13). Mr. Letofsky agrees that he still handles recovery claims for Subrogation and AON. (Pl.'s Rep. at 2). However, no retainer agreement or other contract between AON and Letofsky & Watkins has been produced. Defendants have produced an invoice for payment submitted on September 23, 2009 from Watkins & Letofsky to Subrogation, at which point Subrogation had already been purchased by AON. (Defs.' Exh. A). However, there is no evidence to indicate whether Subrogation or AON ever paid this bill. Mr. Letofsky also states that the contract between Pierce & Weiss and Subrogation executed in 2005 represents the only written agreement that has been formed between the parties over the time period during which Subrogation assigned cases to Pierce & Weiss. (Pl.'s Rep. at 2).

Turning to the six factor test set forth in Merck Eprova AG, here, there clearly was a fee arrangement between Subrogation and the Pierce Firm and there is some evidence that fees were paid by AON to Watkins & Letofsky, although it is unclear if payment was made pursuant to the

terms of the old Subrogation agreement or some other arrangment. As to the second factor in the test, no written agreement between AON and Watkins & Letofsky has been provided; the only formal agreement appears to be the 2005 Contract between Subrogation and the Pierce Firm. It is clear that as to the third factor, Watkins & Letofsky did not perform gratuitous legal services. As to factors four and five, these do not appear to be applicable because Letofsky has not actually represented AON as a named party in any litigation, and therefore, there is no claim that the lawyer excluded a client from any aspect of a litigation. As to factor six, AON's subjective view of its relationship with Watkins & Letofsky, according to Mr. Gianelli, was that Watkins & Letofsky was retained as their counsel to handle subrogation actions assigned to AON by insurance companies and other third parties. The exact fee arrangement between AON and Watkins & Letofsky is unknown, but according to the invoice submitted it is based on an hourly rate. (Defs.' Exh. A).

Thus, the main factor suggesting that AON is a current client of Watkins & Letofsky is the fact that Watkins & Letofsky handles cases assigned to it by AON, charges AON for its work, and presumably receives payment for this work. Although Mr. Letofsky represented to the Court during the hearing held on January 7, 2010, that he confers on a regular basis with the insurance carriers and other entities regarding the progress of litigation and settlement strategies (Tr. at 14, 16), it is undisputed that he is handling the cases on behalf of AON. Moreover, Letofsky does not appear to have entered into a separate retainer agreement with the insurance carriers or other entities on whose behalf the suits have been brought, and Mr. Gianelli confirms that attorneys retained by AON have no contractual relationship with the customers of AON. (Gianelli Aff. ¶ 11).

15

In Commercial Union Insurance Co. v. Marco International Corp., the court, in a subrogation action where the insurance carrier was pursuing a claim in the name of its insured, held that the insurance company was the real client and not the insured even though the insured was the named party in the caption. The court noted that in such subrogation actions, the insured typically gives up all rights to the action after receiving payment from the insurance company. 75 F. Supp. 2d 108, 111 (S.D.N.Y. 1999). A similar arrangment appears to be present here, although the parties disagree on the relationship between AON/Subrogation and the insurance companies which assign them subrogation actions. Whether the insurance companies retain any decision-making power over the litigation is disputed.

Nevertheless, bills submitted by Watkins & Letofsky to Subrogation/AON are sufficient to establish a current attorney-client relationship for the purposes of determining whether a conflict of interest exists. While there is no reason to believe that Mr. Letofsky would fail to pursue cases assigned to him by AON to the best of his ability simply because he was pursuing fees from AON on behalf of the Pierce Firm, "where divided loyalties exist, a lawyer may inadvertently, and despite the best of motives, be influenced and act detrimentally to the client, or the appearance of misconduct will be unavoidable." Kelly v. Greason, 23 N.Y.2d 368, 378, 244 N.E.2d 456, 462 (1968) (citations omitted). Of course, while AON has the option of terminating Mr. Letofksy's representation in connection with other cases assigned to him, that is not a facotr that the Court may consider in this analysis. The decision to terminate the lawyer's services in other cases where he may have expended significant resources to date is the prerogative of the client, not the Court's. Given the stringent parameters that the Second Circuit has set, forbidding the representation of one client with adverse interests to another, this Court is of the opinion that

16

Mr. Letofsky is conflicted and must be disqualified from representing the Pierce Firm in this matter.

## C. Conflict between a Current Client and a Former Client

A potential conflict also exists between Watkins & Letofsky's current representation of the Pierce Firm and its former representation of Subrogation. Again, Mr. Letofsky denies that Subrogation was a former client, claiming that it merely assigned him cases and was not a named party.

According to the 2005 Contract between Subrogation and the Pierce Firm, the Pierce Firm was to receive both hourly and contingent fees in connection with the representation of Core-Mark, to be paid by Subrogation (thereafter acquired by AON Partners). (Defs.' Exh. B at 3-4). Subrogation hired the Pierce Firm, and under the terms of the Contract, Subrogation had the right to terminate the Firm at any time. (Id. ¶ 11). The Contract further provides that Subrogation also had the absolute right to approve or reject any settlement offer. (Id. ¶ 6). However, Mr. Letofsky claims that Core-Mark terminated its relationship with Subrogation in the fall of 2006. (Pl.'s Rep. at 1).

The question again is whether Subrogation should indeed be considered a former client of Mr. Letofsky. Again, it does not appear that the Pierce Firm entered into a separate retainer agreement with the insurance carriers or other entities on whose behalf the suits have been brought. As discussed supra, under the terms of the Contract, Subrogation had a reasonable belief that the Pierce Firm, as represented by Mr. Letofsky at the time, was representing its interests, owed a duty of loyalty to Subrogation, and that it was his client. Even though Mr.

17

Letofsky later left Pierce & Weiss, he continued to represent Core-Mark. Since Subrogation had the right to approve or reject settlement offers, it did possess at least some rights that a client normally would have. In that way, Subrogation stood in the shoes of Core-Mark and took its place as the true client.[11] This Court finds that just as AON has sufficient contacts with Mr. Letofsky to be considered a current client, Subrogation also had sufficient contacts to be considered Mr. Letofksy's former client.[12]

> Rule 1.9 of the New York Code of Professional Conduct provides as follows:
>
> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

N.Y. Rules of Prof. Conduct 1.9(a), 22 N.Y.C. R.R. § 1200. Rule 1.9 also states that:

> . . . a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client: (1) whose interests are materially adverse to that person; and (2) about whom the lawyer had acquired information protected by Rules 1.6 or paragraph (c) of this Rule that is material to the matter.

Id. In a case decided before the new rules were implemented, the Second Circuit held that an

---

[11]In certain cases where the attorney-client relationship is non-traditional or vicarious, the burden for disqualification may be higher, such as where a law firm files suit against a corporation which is a member of an association which the law firm represents. Glueck v. Jonathan Logan, Inc., 653 F.2d 746 (2d Cir. 1981) (holding that disqualification was proper). Whether an attorney-client relationship is vicarious depends on whether there is an intermediary between the attorney and the client. See British Airways, PLC v. Port Authority of New York and New Jersey, 862 F. Supp. 889, 895-96 (E.D.N.Y. 1994). In this case, there was a direct relationship between Subrogation and Mr. Letofsky since they entered into a written agreement relating to the representation.

[12]As noted previously, since Core-Mark terminated Subrogation in fall of 2006, Subrogation no longer has any interest in the outcome of the Core-Mark litigation. As a result, neither does AON Recovery.

attorney who seeks to represent a current client against a former client may only be disqualified if:

> (1) the moving party is a former client of the adverse party's counsel;
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d at 133.

It has already been established that Subrogation could be considered a former client of Mr. Letofsky. As to the second prong, there is certainly a substantial relationship between the subject matter of counsel's prior representation of Subrogation in the Core-Mark litigation and the issues in the present lawsuit, concerning a fee dispute over fees owed to Pierce & Weiss in connection with that case. However, the third prong requires that the attorney whose disqualification is sought had access to relevant privileged information. Although defendants do not present any evidence that Mr. Letofsky had access to any such privileged information, given that Subrogation had the right under the Contract to participate in settlement negotiations, there was an expectation that such discussions would remain privileged. Therefore, to the extent that this expectation would satisfy the Hempstead Video's third prong, Mr. Letofsky would be disqualified based on his former representation of Subrogation.

## D. Letofsky as a Potential Witness

Defendants also argue that Mr. Letofsky should be disqualified from representing the Pierce Firm because there is a strong possibility that Mr. Letofsky would have to testify in the

event this case reaches trial. Since Mr. Letofsky was a member of the Pierce Firm when the

current dispute arose, and he was responsible for negotiating the fee contract between the Pierce

Firm and defendants, his testimony could be required to determine the facts of the current case.

Under the Rules, lawyers may not act as both witness and advocate unless certain exceptions

apply. Rule 3.7 states:

> A lawyer shall not act as advocate before a tribunal in a matter in which the
> lawyer is likely to be a witness on a significant issue of fact unless:
> (1) the testimony relates solely to an uncontested issue;
> (2) the testimony relates solely to the nature and value of legal services rendered
> in the matter;
> (3) disqualification of the lawyer would work substantial hardship on the client;
> (4) the testimony will relate solely to a matter of formality, and there is no reason
> to believe that substantial evidence will be offered in opposition to the testimony;
> or
> (5) the testimony is authorized by the tribunal.

N.Y. Code of Prof. Conduct Rule 3.7, 22 N.Y.C. R.R. 1200.[13] Defendants contend that in this

case, Mr. Letofsky could potentially be called upon to testify about his understanding of the

parties' positions in connection with the fee dispute between the Pierce Firm and Subrogation,

because Mr. Letofsky negotiated and signed the Contract on behalf of the Pierce Firm. However,

if there is no ambiguity in the terms of the Contract, Mr. Letofsky's testimony may in fact not be

required. Similarly, if his testimony relates only to the value and nature of the legal services

provided, this is a specific exemption under Rule 3.7 that would not require disqualification.

Thus, in the absence of more information about the nature of the dispute in this case, it is

impossible to predict whether Mr. Letofsky's testimony will be required. Since the Court has

---

[13]Furthermore, "[a] lawyer may not act as an advocate before a tribunal in a matter if . . .
another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other
than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client."
N.Y. Code of Prof. Conduct Rule § 3.7(b)(1), 22 N.Y.C. R.R. 1200.

already determined that disqualification of Letofsky is required based on his concurrent

representation of clients with adverse interests, the Court does not decide whether Rule 3.7

provides an independent rationale for his disqualification in this case.


F. Disqualification of The Firm of Watkins & Letofsky

Finally, defendants argue that even though Mr. Watkins has never represented either

AON or Subrogation, his motion for admission pro hac vice should also be denied for the same

reason that Mr. Letofsky should not be permitted to represent both the Pierce Firm and AON.

"[A]n attorney's conflicts are ordinarily imputed to his firm based on the presumption that

"associated" attorneys share client confidences." Hempstead Video, Inc. v. Incorporated Village

of Valley Stream, 409 F.3d at 133. There is a presumption that if one attorney is conflicted, then

the entire firm is conflicted; this presumption may, however, be rebutted if a screen is in place or

the conflicted attorney is only partially associated with the firm (i.e. has "of counsel" status). Id.

However, plaintiffs have not argued that any screen is currently in place. Both Mr. Letofsky and

Mr. Watkins are full partners of their firm, which at present appears to have only three partners in

total.[14] Therefore, if Mr. Letofsky is deemed to be conflicted, the entire firm will also be deemed

conflicted and Mr. Watkins would also be disqualified from representing plaintiff in this case.

Accordingly, since the Court finds that Mr. Letofsky has been deemed to be conflicted

based on his current representation of AON in other cases, the entire firm of Watkins & Letofsky

is disqualified from representing Pierce & Weiss, and the Court denies Mr. Watkins' motion for

---

[14]See firm website at: http://www.wcllp.net

21

admission pro hac vice.[15]

## CONCLUSION

Based on the foregoing, the Court concludes that Mr. Letofsky has a conflict of interest

that disqualifies him from representing plaintiff in this case. Accordingly, the Court denies the

applications of Mr. Letofsky and Mr. Watkins for admission pro hac vice. Plaintiff is given 30

days to obtain new counsel. A status conference with this Court is scheduled for March 19, 2010

at 10am.


**SO ORDERED.**

Dated: Brooklyn, New York
       February 12, 2010

                                        _Cheryl Pall_
                                        Cheryl L. Pollak
                                        United States Magistrate Judge
                                        Eastern District of New York

---

[15]The Court notes that there is minimal prejudice to plaintiff in denying the motion for pro hac vice at this time. Neither Mr. Letofksy or Mr. Watkins have been involved in the instant case as counsel; until October 28, 2009, the Firm was represented by an entirely different attorney and nothing has transpired in the case since his withdrawal. Therefore, except for the time occasioned by this controversy, Watkins & Letofsky has not expended a significant amount of time or resources as counsel in this action.

22